Hope C. Lefeber, Esquire
I.D. No. 31102
Hope C. Lefeber, LLC
Two Penn Center
1500 JFK Boulevard; Suite 1205
Philadelphia, PA   19102
(610) 668-7927                                                        Attorney for Defendant
_____

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA             :

           v.                                             :          Criminal No. 22-CR-00071

SAMUEL LAZAR                                    :          FILED UNDER SEAL


DEFENDANT SAMUEL LAZAR'S SENTENCING MEMORANDUM
AND
MOTION FOR DOWNWARD VARIANCE


        This Sentencing Memorandum is submitted on behalf of Samuel Lazar who is

scheduled to be sentenced by this Court on August 12, 2022.  Mr. Lazar has pled guilty to one

count of Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, in

violation of 18 U.S.C. §111(a)(1) and (b).

        Pursuant to the Plea Agreement, dated January 11, 2022, *Sentencing Guidelines*

*Analysis*, ¶4, the parties agreed that the following analysis applied:

1

| | | |
|---|---|---|
| U.S.S.G. §2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. §2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. §2A2.2(b)(7) | 19 U.S.C. §111(b) Conviction | +6 |
| Total | | 26 |
| U.S.S.G. §3E1.1 | Acceptance of Responsibility | -3 |

**Total Offense Level**                                23

The Probation Officer added an additional three (3) point enhancement pursuant to U.S.S.G. §2A2.2(b)(3)(A) for bodily injury, that was not sought by the government because there exist no medical records, nor does the government have any information that the police officer did anything other than wipe his eye, immediately after coming into contact with the lachrymatory agent, whereupon he then resumed his duties.  The defense objection to this enhancement is set forth in *Objections to the Presentence Investigation Report* at p.    below.

Therefore, pursuant to the Plea Agreement, the parties agreed that the sentencing guideline Total Offense level is 23 with a criminal history category of I, resulting in a guideline advisory sentencing range of 46-57 months' imprisonment.  The Probation Officer's calculations, including the objected to enhancement, results in a Total Offense Level of 26, with an advisory sentencing range of 63-78 months imprisonment.

As detailed below, we respectfully submit that in light of Mr. Lazar's history of caring for and supporting his family, friends, co-workers and the community, his extraordinary acceptance of responsibility ███████████████████, the extremely harsh prison conditions that he has endured and his genuine demonstration of remorse and rehabilitation, that a sentence of time served is appropriate.

Mr. Lazar is deeply remorseful for his conduct on January 6, 2021.  As will be more fully explained below, his behavior was completely out of character for him as he is an extremely respectful, law abiding citizen who has deep respect and appreciation for law enforcement.  *See Letter of Samuel Lazar*, attached hereto and marked Exhibit "B."

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

It is clear from the numerous, heartfelt letters written by people from all walks of life, who have had enduring relationships with Sam throughout their lifetimes, that he is unanimously viewed as a reliable, compassionate and caring individual and a very positive influence in their lives. Sam's behavior in connection with the charges in this case is at odds with the man known by his family, friends, peers and his community for his extraordinary compassion, kindness and generosity.  *See Character Letters*, attached hereto and marked Exhibit "A."

## I.   PERSONAL BACKGROUND



Mr. Lazar is a thirty-seven (37) year old man who was born in Queens, New York, to the union of David Lazar, a doorman and Aurelia Lazar, a cafeteria worker and former owner of a travel agency; they have been married for forty-seven (47) years.  Both parents are Romanian immigrants who raised their five (5) children with both love and discipline, instilling the value of hard work, family and religion.  Unfortunately, Sam left high school in the ninth grade for a variety of reasons and began working in the construction business.  His mother explained that he feared the "bad gangs" in the New York public schools and he also stated that he struggled with the subject matter.  He is an extremely hard worker, has been gainfully employed throughout his adult life and has worked at a variety of jobs ever since he was a teenager.  Prior to his incarceration, he was self-employed as a contractor making and installing butcher block countertops.  In addition, he buys restaurant and industrial equipment, antiques and furniture and sells on Ecommerce and Ebay for profit.

Sam is very devoted to his parents, children, siblings and grandparents and partner, Autumn Hickey.  His parents, in speaking of his devotion to his family, noted the "[e]very time when he would go to Romania to visit his grandparents and all the relatives he did a few good deeds for every one of them." *Letter of Aurelia and David Lazar*, Ex. "A," at p. 23.   His sister, Rebeca Lazar shares the same experience, "when in times of need I know I can always count on Samuel to be there, whether it's to lend a helping hand or an ear to listen he is there….What drives Samuel is his perseverance and love for what he does and for whom he does it for, family, friends, his loved ones , and anyone he comes in contact with." *Letter of Rebeca Lazar*, Ex. "A," at p. 27.  Laura Neumann, his sister, speaks of his positive attitude and helpful nature:  "His generous and positive nature endears him to everyone in the family and anyone he meets…Everyone who knows my brother will all mention his generosity, optimistic

approach to life and kindness that he has shown to many some friends and family and some

strangers that he only met once." *Letter of  Laura Neumann*, Ex. "A," at p 5.

The many letters written on Sam's behalf depict an extraordinarily loving and devoted

father, son, brother, friend, and partner. His friend Courtney Lazar, best depicted these

qualities, in saying: "He has helped me personally on multiple occasions and is ALWAYS

willing to give the shirt off his back to someone in need.  Be it family, friends and loved ones.

*Letter of Courtney Lazar*,  Ex. "A," at p. 16.  Paolo Esposito, a friend of twenty-five (25) years,

echoes this feeling:

> We have grown up together and are now raising our own kids.
> He is one of the best guys I know.  He is like a brother to me.
>
> Sam has always been there for me.  He is a great family man,
> putting kids first. Sam is a fun loving guy who would give
> you the shirt off his back.  Whenever we talk he asks about
> my family first.  He always pushes me to do better for myself
> and my family.  Sam is a friend who I know that I could always
> depend on. *Letter of Paolo Esposito*, Ex. "A," at p. 8.

His love for his family and friends manifests itself through his unwavering commitment

to them in myriad ways.  Most important, he has been a constant presence in their lives,

through physical and mental illnesses and the trials and tribulations of life.  Sera Gadbois, a

friend since 1995 remembers:

> In 2008, my younger brother died after a tragic accident.
> Samuel dropped everything to come to my family's side.
> He put his business on hold, he made arrangements for
> his partner and children and drove over 400 miles to be
> with us.  He was never judgmental or harsh, and even
> though he was dealing with his own pain and grieving
> the loss of one of his own best friends, he was able to
> also lovingly hold space for our loss and support us.
> *Letter of Sera Gadbois*, Ex. "A," at p. 9.

Similarly, his neighbor, Sherrie Anderson, states that "[h]e has been nothing but an outstanding

neighbor/friend.  He always has a smile and nothing but positive thoughts every chance I see

him.  He is a very caring and spiritual being.  He has been an ear to listen and a heart to care.
Sam is one of the kindest and caring people I have in my life." *Letter of Sherrie Anderson*, Ex.
"A," at p. 17.

## II.      ACTS OF EXTRAORDINARY GENEROSITY AND COMMITMENT

The crime that the defendant committed, his actions and his words, stand in stark
contrast to the person that he truly is and the life that he led prior to that fateful day.  The
letters depict a god-fearing man of high integrity, who loves his country and has the utmost
respect and admiration for law enforcement.  The son of immigrant parents from Romania, he
feels honored and blessed to live in this country.  Sam is a quiet, family man who is kind-
hearted and compassionate to his fellow persons.

### A.  Family and Friends

Everyone with whom Sam comes into contact credits him with extraordinary
compassion, integrity and commitment, a person of outstanding character.  In their letters, so
many friends and family remark about his commitment and compassion for them.  His friend,
Nick Mantzavas, notes that "Samuel has a strong sense of duty, which applies to his job, his
family, and his community.  He also possesses a great deal of integrity and constantly strives to
make sure he is doing the right thing." *Letter of Nick Mantzavas*, Ex. "A," at p. 11.

The words that he uttered and the actions he took on January 6th are the antithesis of
who he is.  Maria Achenbach remarks: "Sam does not have a mean bone in his body.  I have
never seen him angry.  In fact, he is the one to talk someone down/calm them down.  He only
wants the best for everyone that comes across his path. *Letter of Maria Achenbach*, Ex. "A," at
p. 1.  Similarly, Alina Oprea remarks: "Sam has always been an affectionate, comedic, warm

person with a big heart…he has always been the kind of brother, friend and person that is always quick to lend a helping hand to anyone in need…Sam is a very loyal person, brother and friend." *Letter of Alina Oprea*, Ex. "A," at pp 2-3.   As Gilbert McDonald writes, "Sam is a man of high character, integrity and most importantly shows his love for all people whether it be his immediate family, friends or total strangers.  *Letter of Gilbert McDonald*, Ex. "B," at p. 26.

Sam is also an extraordinarily devoted father to his two children.  Mr. Sullivan notes:

> I have been with Sam and the kids many times and his love and caring for the two of them is unparalleled.  His kids mean the world to him and it is so evident to seen when they are with him. *Letter of Gilbert McDonald*, Ex. "B," at pp. 26-27.

His love for his children manifests itself through both words and actions.  As Maria Achenbach observed:

> Sam is very family oriented you can tell by the way he is with his two beautiful children.  He would always be throwing the football with his son, laughing, giving dad advice to his daughter.  He is so proud of his children;  he is always talking about them and what they do and how he cannot wait to watch them grow and become successful in life. *Letter of Maria Achenbach*, Ex. "A," at p. 1.

Brianna Esposito shares this sentiment and explains Sam's devotion to his children and respect for others:

> Sam is a Godly man.  He is a family man.  He is proud of his children and would give them the world. His nieces and nephews adore him.  I haven't me anyone who Sam hasn't shown respect to, and he would go out of his way to help you. *Letter of Brianna Esposito*, Ex. "A," at p. 15.

As his mother and father describe, "[h]e has a heart of a responsible father and knows his kids need him in all aspects of life. *Letter of Aurelia and David Lazar*, Ex. "A," at p. 23.

B.  <u>Work Ethic, Faith and Respect for Law Enforcement</u>

Given the nature of the charges in this case, one would assume that the defendant would be a defiant individual who operates with callous disregard for law enforcement and authority.  Ironically, precisely the opposite is true.  Most people who know him speak of Sam's love and respect for this country and for law enforcement officers.  Courtney Von Ronn notes:

> Mr. Lazar has always been an upstanding individual and someone to truly look up to.  He is the epitome of living the 'American dream.'  He has built himself from the ground up and has always shown love for God, country, liberty and knows the road to pursue happiness.

> *Letter of Courtney Lazar*, Ex. "A," at p. 16.

Those who know Sam describe him as a passionate, God-fearing man who not only loves this country, but has a very deep appreciation for the opportunities this country affords him.  He is the first child in his family to be born in the United States; his sisters and his parents were born in Romania.  He learned, first hand, from his family of the hardships they endured abroad.  His friend, Charles Meck, a former Sergeant in the United States Army, who served thirty-five (35) years in active duty, National Guard and Army reserve and a combat veteran, having served in the Iraq war, remarks that Sam "has a very strong sense of patriotism and a sincere love of god and country."  *Letter of Charles Meck*, Ex. "A," at p. 22.

Indeed, Sam is deeply appreciative and respectful of law enforcement.  Following the rioting in the cities following the George Floyd debacle and the defund the police movement, Sam wanted to show his respect for the work that the local police did and so he purchased thirty (30) boxes of pizza and he and his sisters, brother, children and friends delivered them to the local precinct in Lancaster, Pennsylvania.  This was Sam's way of boosting morale and showing the police officers that their work was valued.  Below is a picture:

8



Sam appears directly below the flag.  His sister, Laura Neuman, describes her brother:

> He has always valued the freedom that we all value in America
> and to that end the justice system which he has always believed
> in.  He has come to appreciate law enforcement and has always
> tried to do what he can to help.  From offering discounts to law
> enforcement officers that he has done jobs for and even showing
> his appreciation by taking pizza to his local precinct.

*Letter of Laura Neumann,* Ex. "A," at p. 5.

Lastly, Sam has an extremely strong work ethic, having worked steadily since being a teenager.  Since 2010, he has been self-employed in Ecommerce, selling a variety of items, including antiques, furniture, restaurant and industrial equipment, etc., on the internet.  He purchases items on the internet and from auctions and sells them on eBay.  In 2015, he also began purchasing house, remodeling them and selling them.  This business continued until his incarceration in this case.  He also paid voluntary child support, monthly, until his incarceration.  J. Andrew Brubaker, a friend since 2009, who worked with Sam rehabbing a property, states that "[d]uring that time, I saw Sam work harder than any other person I know." He adds that "I have not known anyone remotely close to as generous and caring as he is every day…He is always ready to get his boots on the ground and get to work." *Letter of J. Andrew Brubaker*, Ex. "A," at p. 7.

### III.   <u>RELEVANT SENTENCING FACTORS</u>

District courts possess "broad discretion in imposing a sentence within a statutory range."  *United States v. Booker*, 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), 125 S.Ct. 738; *United States v. Folk*, 954 F.3d 597, 605 (3d Cir. 2020). When sentencing a defendant, the court must consider the applicable Guidelines offense level, which is advisory, and the factors enumerated in Title 18, United States Code, Section 3553(a).[2]

---

[2] Section 3553(a) provides that when sentencing a defendant, the court must consider a number of factors:
(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  the need for the sentence imposed –
    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)  to afford adequate deterrence to criminal conduct;
    (C)  to protect the public from further crimes of the defendant; and
    (D)  to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.
(3)  the kinds of sentences available;

*United States v. Booker*, 543 U.S. 220 (2005); *United States v. Folk*, 954 F.3d 597, 605 (3d

Cir. 2020).    The advisory Guidelines are the "starting point and the initial benchmark for

sentencing." *Beckles v. United States*, ⎯⎯ U.S. ⎯⎯, 137 S. Ct. 886, 894, 197 L.Ed.2d 145

(2017)*Id.* at 894 (quoting *Gall*, 552 U.S. at 49, 128 S.Ct. 586 (internal quotation marks

omitted)) .  A sentencing court may not rely exclusively on the Guidelines range; rather, the

court must make an individualized assessment based on the facts presented and the other

statutory factors." *Id.* at 894 (quoting *Gall*, 552 U.S. at 49, 128 S.Ct. 586 (internal quotation

marks omitted)).The sentence imposed must be "sufficient, but not greater than necessary" to

comply with the purposes set forth in Section 3553(a)(2). 18 U.S.C. § 3553(a).


### A.  <u>**The Nature and Circumstances of the Offense**</u>


There is no question that what transpired on January 6, 2021 was a hideous assault

upon our democracy.  The violence and brazen actions of the perpetrators in storming our

Capitol left the nation vulnerable and diminished.  Our nation, a beacon of hope and

democracy in the world is left forever tarnished by what occurred.  Regardless of our political

affiliations, all law-abiding Americans are repulsed by the actions of the lawless mob.

Irrespective of our natural aversion to what transpired, it is essential, for purposes of

this sentencing, to focus on the precise individual actions and intentions of the defendant, on

that day in order, to achieve a sentence that is fair and just under the circumstances of his case.

Many people did many things on that day, not all arrived with malevolent and/or criminal

---

(4)  the kind of sentence and the sentencing range established for  --
        (A)  the applicable category of offense committed by the applicable category of the defendant as set forth
in the Guidelines – (i) issued by the sentencing commission . . .;
(5)  any pertinent policy statement
        (A) issued by the sentencing commission . . .;
(6)  the need to avoid unwarranted sentencing disparities among defendants with similar records who have been
found guilty of similar conduct; and

intentions.  While the prior intentions and motivations of the perpetrator of a crime may not be relevant for purposes of establishing the essential elements the offense for conviction, they are important to consider for sentencing.  The circumstances surrounding the commission of the instant offense sheds light upon who the defendant is, whether he represents a danger to the community and whether he is in need of further punishment and rehabilitation.

Sam did not arrive at the Capitol on January 6th with the intention to engage in any form of violence.  He came with his sister and a female friend of his sister and met up with his brother and two friends.  He brought no weapons or any instruments of a crime.  The only thing he brought was his bullhorn which he had brought to previous political rallies to play both patriotic and Christian music.  He wore a camouflage vest because, a month before, he had a frightening experience at a rally where Antifa supporters had stabbed someone and attacked Trump supporters with stun guns and mace.  He explains that he wanted to appear menacing so that no anti-Trump demonstrators would harm him on January 6th.

What ensued was undeniably wrong and Sam immediately accepted responsibility, pled guilty and did everything in his power to cooperate with the government and assist law enforcement in every way he could.  He realized that he had been swept up in the false narrative spun by the President of the United States who, as Vice chair of January 6th Committee, Liz Cheney, stated: "…falsely told the American people that the election was not legitimate, in his words, 'a major fraud.'  Millions of Americans believed him." *Transcript of June 9, 2022, Select Committee Meeting,* pp. 2-3.  Regrettably, Sam was one of them.  He blindly followed President Trump's cry to "fight like hell to take back the country."  As Chairman Bene Thompson explained:  "…[h]e betrayed the trust of the American people…He lied to his supporters and the country…[A]s a result of his [election] loss, [he] decided to wage

---

(7)  the need to provide restitution to any victims of the offense.

an attack on our democracy…And in doing so, lit the fuse that led to the horrific violence of January 6th…" *Transcript of June 9, 2022, Select Committee Meeting,* pp. 1-2.  This, however, is no excuse, as each individual is responsible for the exercise of their own free will and choices.  The choice to violate the law is never an option.  We raise these statements not as an excuse or justification, but, rather, as part of the background and circumstances that led an otherwise law-abiding man to commit an act which is completely at odds with his nature.

The defendant pled guilty to an assault upon an officer with a deadly weapon.  He never breached the police barricades, never ascended the steps to the Capitol, nor did he ever enter the Capitol.  What must be underscored here is that what transpired – i.e. the actions for which the defendant was convicted, happened as a split second reaction after being maced by the officers.  His conduct happened in three (3) seconds.  What he did was dead wrong; we make no mistake about that.  He unlawfully and menacingly approached officers behind the bike racks that were set up on a landing at the bottom of the steps to the Capitol Building on the west side parkway and shook the rack, displaying a tear gas canister that he had picked up off the floor.  Immediately, an officer sprayed tear gas at him and he fell back a distance of at approximately fifteen (15) feet down a few steps to the street.  While he fell backwards, the canister in his hand accidentally discharged, but it was downwards and not in the direction of the officers.  There is no dispute as to this and this is not the discharge that gives rise to the instant charge.  However, immediately upon regaining his footing, he intentionally discharged the canister in the direction of the police officers who stood at least fifteen (15) away, causing one officer to use his finger to rub his eye.  The officer then continued his duties and did not seek medical treatment as a result of this incident.  The defendant was not arrested and continued to remain in the area, but never went inside the Capitol.  He later uttered repulsive

language towards law enforcement and fighting words to arouse a crowd that was milling around.  No one responded nor took any action in response to his words.

While Sam's actions were criminal and satisfied the elements of 18 U.S.C.§111(b), the crime to which he pled, it is important to distinguish this conduct from the actions of the violent mob that stormed the Capitol, attacking police officers with dangerous weapons, striking blows and inflicting serious bodily injury designed to overcome their force and authority in order to reach the Capitol and cause bodily injury to our elected officials.  In the instant case, Sam acted criminally in his momentary reaction to being hit in the face with mace. He was angry, acted out by intentionally discharging his canister, once, and for that lack of judgment, he will forever bear the indelible mark of having committed this felony offense. However, he is charged with precisely the same crime – i.e. assaulting certain officers with a deadly weapon, in violation of 18 U.S.C. §111 (b) as the perpetrators of the extreme violence that we have witnessed in the footage of that day.

### B.  Sam Lazar's History and Characteristics

### 1.  Devotion to Family, Friends and This Country

Sam has been steadfast in his devotion to his children and family.  He has been very much a part of his children's lives – participating in their school and extracurricular activities. As the numerous letters indicate he is also extremely devoted to his parents, grandparents, sisters and family

He is not the monster that his actions on January 6th would lead us to believe.  Sam's family, friends and co-workers unanimously describe his extraordinarily kind, compassionate and supportive nature:

> Samuel has always been generous and kind hearted, drawn to help the
> disadvantaged…from bringing the homeless man panhandling a

> sandwich to collecting leftover food in the trash cans at the local
> agricultural fairs to feed the stray cats, he always found a way to 'do
> something' rather than ignore the troubles he saw.
> *Letter of Sera Gadbois*, Ex. "A," at p. 9.

Moreover, his words and his actions on January 6th do not reflect his respect for law enforcement and appreciation for this country. Viewing his conduct on that day, he appears utterly contemptuous of authority, law-enforcement and the rule of law. Nothing could be farther from the truth about who Sam is. In truth, he has the ultimate respect for the police and has the deepest respect and appreciation for our democracy and the freedoms that he enjoys. Although it is only one example, his actions in purchasing boxes of pizza and bringing them to support his local police, speak volumes about his attitude towards law enforcement. His letter to this Court genuinely underscores this sentiment. Being the first generation born to parents and siblings from a communist country, he has learned, firsthand, about the excesses of authoritarian regimes and has grown to have immense respect for our men and women of law enforcement. In his letter to the Court, he expresses his extraordinary admiration for the job they do, the risks they take and the difficulty inherent in their responsibilities in enforcing the law.

### 2.  Remorse, Acceptance of Responsibility, Rehabilitation

Regret and remorse can manifest itself in myriad ways. Virtually every criminal defendant regrets their actions, but what is most important is not only the sincerity of the expressions of repentance, but whether they are sustainable. Actions as well as words are important in determining sincerity and sustainability.

Sam has been disgraced and humiliated by his actions. He was extremely proud of all that he achieved and his ability to provide for his family. This episode stands in complete dissonance to the moral standards he tries to live by. In his letter to the Court, he acknowledges

his "despicable behavior" for which he feels "deep shame and regret," the thought of which gives him "knots in [my] stomach." He further explains that his actions "go[es] against everything I hold dear and stand for" and states that "I don't know who I was, I feel terrible everyday about the way I spoke to the people I hold in such high regard, I feel awful." *Letter to Court*, Ex. "B," at pp. 1-2.

When Sam left the Capitol area in the afternoon on January 6ᵗʰ, and returned to his Airbnb he immediately knew that what he did was horribly wrong and has felt humiliated and shamed by his actions to this day. From that night forth, he never discussed his actions, bragged, posted on social media or in any way sought to extol the his or anyone other's lawless actions of that day. It is respectfully submitted that this silence evidences his regret and remorse.

███████████████████████████

████████████████████████████████

███████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████

C.   **Seriousness of the Offense, Just Punishment and Deterrence**

Many factors pertaining to the nature of the offense lead to the conclusion that a sentence that permits Sam to return to his family and the community would be just.  Sam acknowledges that he committed a serious offense and would never consider such actions ever again.

In sentencing Mr. Lazar, this Court must consider the crime for which he is charged and the circumstances surrounding his conduct against the backdrop of his life and deeds, and the evidence of remorse and self-introspection that Mr. Lazar has demonstrated. Given the impact that this investigation and criminal proceedings have had on Mr. Lazar, his extraordinary acceptance of responsibility and his history as an extremely compassionate, supportive and committed human being, it is clear that there is no risk that Mr. Lazar will violate the law in the future.

The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capital and the negative publicity and collateral consequences attendant to the convictions for all of those involved.  Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment.  Mr. Lazar's conduct on January 6th was wrong, but it must be underscored that he did not engage in aggressive acts of violence with the intent to break down police barricades or harm officers, did not ever enter the Capitol and went home that night, never uttering another word to another about that fateful day.  He knew he was wrong and regretted his actions immediately.  By his words and his deeds from that night forth, he has demonstrated genuine remorse and contrition. Mr. Lazar's likelihood of recidivism is really non-existent.  His acceptance of responsibility was swift, complete and without reservation.

**D.**   <u>**Need to Avoid Unwarranted Sentencing Disparities**</u>

18 U.S.C. §3553(a)(6) instructs that one of the factors to be considered by the court when imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Although the tragedy of January 6th was experienced by the Nation as a whole, each individual defendant is unique.  In some ways Mr. Lazar is similar to many other January 6th defendants who were caught up with the mob that day, acting on impulse and without thought to the consequences of their actions.  While his action in emitting one spray at the police officers from a distance was a very serious criminal act, others who performed far more violent assaults have been afforded greater consideration in the final charges that they were required to plead to.

It is very difficult to obtain information regarding individuals who are similarly situated to Mr. Lazar as the dockets of cooperating defendants involved in the events of January 6th are sealed.  Therefore, the defense is not able to cite cases wherein a 5K1.1 Motion was granted under similar factual circumstances.  Further it is hard to find a comparable case wherein a defendant discharged <u>one</u> spray of a lachrymatory agent against an officer and was charged with a violation of 18 U.S.C. §111(b).

What we have learned is that in at least three (3) cases involving individuals who were charged with an assault upon a police officer, in violation of 18 U.S.C. §111(b), this serious charge was dropped and the defendants were charged with less serious offenses, and, therefore, were facing significantly lower guidelines.  *See United States v. George Tanios,* Case No. 1:21-cr-00222-TFH-2; *United States v. David Blair*, Case No. 1:21-cr-00186-CRC-1 (defendant threatened and struck police officer with lacrosse stick in chest; steel knife and tape found in his backpack, ECF 1); *United States v. James Elliott*, Case No 1:21-CR-735 (defendant, a Proud Boy, wearing ballistic vest, helmet, hard-knuckle gloves and carrying a

18

wooden pole with a flag, yelled battle cries and then, as officers sought to replace bicycle rack barriers holding the mob, the defendant swung his flagpole at law enforcement an then thrust the flagpole forward in to the police line, making contact with an officer.  (DE #27)).

In *United States v. George Tanios,* Case No. 1:21-cr-00222-TFH-2, the defendant Tanios and Khater "assaulted law enforcement with an unknown chemical substance directly in the face and eyes."  Law enforcement observed that "…these defendants appeared to time the deployment of chemical substances to coincide with other rioters' efforts to forcibly remove the bike rack barriers that were preventing the rioters from moving closer to the Capitol building"  Law enforcement concluded that: "the two [defendants] were working in concert and had a plan to use the toxic spray against law enforcement."  *Ibid.,* Complaint  (DE #1-1), pp. 2-3.  Defendant Tanios was sentenced to time-served after having spent twenty-two (22) months in prison.

In *United States v. David Blair*, Case No. 1:21-cr-00186-CRC-1, defendant Blair yelled menacing words at the officers and as the officers advanced, he jumped back to face an officer holding a lacrosse stick attached to the Confederate flag with two hands, shouting menacing threats.  Thereafter Blair thrust the stick at the officers' chest area, striking him and was later restrained by other officers using their batons. *Ibid.,* Complaint (DE #1), at pp. 3-4.  In this case, the government moved to dismiss the 18 U.S.C. §111(b) charges and the defendant was sentenced to five (5) months imprisonment.

In *United States v. James Elliott*, Case No 1:21-CR-735, wherein the defendant arrived at the Capitol wearing ballistic vest, helmet, hard-knuckle gloves and carrying a wooden pole with a flag and proceeded to swing his flagpole at law enforcement an then thrust the flagpole forward in to the police line, making contact with an officer, the government agreed to dismiss

19

the §111(b) charges and proceed with the lesser included offense of §111(a), resulting in far

lower guidelines.  Defendant Elliot has not yet been sentenced.

In other cases, the defendants who engaged in similar conduct to Mr. Lazar's were

permitted to plead guilty to Civil Disorder, 18 U.S.C. §231:

- *US v. Aaron Mostofsky*, 21-cr-138 (JEB): Defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. § 231(a)(3) and § 641. Mostofsky's guideline range was 10-16 months. He was accused of forcibly engaging in confrontation with police by pushing against a barrier with all of his strength to resist officer efforts to contain the riot. Mr. Mostofsky also took a bullet proof vest that a Capitol Police officer was wearing and later wore the vest along with a riot shield he found.

- *US v. Cooke*, 22-cr-52 (RCL): Defendant sentenced to 12 months and a day after pleading guilty to 18 U.S.C. § 231(a)(1). Cooke joined a crowd confronting officers on the East Side of the Capitol. He grabbed and pushed the bicycle racks being used to block the crowd into officers, held up his middle finger to officers and yelled profanities such as "We're taking this motherfucker" and "this is our fucking house." Cooke encouraged other rioters to push against the police line and struggled with officers himself at the Columbus Doors. While near the doors, he asked the crowd "who's got a hammer" and encouraged others to "smash the windows." Another rioter did break a window with a hammer and Cooke, armed with a flagpole, hit the broken window several times. Cooke was only deterred from entering the Capitol after he was pepper-sprayed.

The defense also points out the case of *United States v. Leffingwell,* Crim. No. 1:21-

CR-00005, which case is best known to this Court.  It would be presumptuous of the defense to

begin to outline the facts of that case since this Court was in a far better position to evaluate all

of the many factors that went into that sentencing decision, however the criminal conduct vis-a

vis the police officers was comparable, although defendant Leffingwell actually hit an officer

with his fists.

In light of all of these cases, and the defendant's significant cooperation with the

government, the defense respectfully submits that a sentence of time served (nineteen (19)

months and twenty (20) days) is appropriate.

*IV.*   **THE SENTENCING GUIDELINES AND MOTION FOR DOWNWARD VARIANCE**

A.      **Objections to Presentence Investigation Report**

1.   **Paragraphs 43, 48 and 52 – U.S.S.G.§2A2.2(b)(3)(A) Enhancement for Bodily Injury**

The defense objects to this enhancement which was not agreed to by and between the government and the defense in the Plea Agreement due to the fact that there were no injuries to the police officer.  The *Statement of the Offense* indicates that the lachrymatory agent caused the officer (M.C.) to "momentarily lose the ability to see."  ¶10   Nothing more.  The definition of bodily injury is defined in §1B1.1, cmt. n. 1(B) as:  "any significant injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."  The video in this case shoes M.C. wiping his eye, momentarily, and continuing to perform his duties.

Douglas Collyer, Assistant United States Attorney, has advised that "because I don't think that M.C. can affirmatively say he injured his ankle because of the spray from Lazar rather than from any or all of the other spray he was exposed to that day," the government did not seek this enhancement. The probation officer's "independent investigation" does not provide any additional proof as to when he missed a step, whether it was hours later, after being sprayed by other participants and/or when he was interviewed.  As of the writing of this Memorandum, the government is seeking supervisory approval to assert that the additional three (3) points should not be scored here.

Clearly, there is an absence of proof by a preponderance of the evidence that the one spray discharged by defendant Lazar caused Officer M.C. to miss a step and injure his ankle at

some unspecified time later in the day.  As such, it is respectfully submitted that this

enhancement must be denied.


**B.**        **Motion for Downward Variance**

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████


**A.**  **The Total Offense Level Grossly Over-Represents The Severity of the Offense
Conduct In This Case**

The defense submits that the total offense level of 26, though stipulated to by reason of

the application of U.S.S.G. 2A2.2, nonetheless, grossly over-represents that severity of the

offense conduct in this case. The same total offense level is applicable to the violent rioters

who breached the Capitol, carrying weapons, batons, shields, knives and a host of other objects

and who viciously attacked the law enforcement officers on that day.   Though the defendant

completely stands by his agreement, for purposes of consideration of a downward variance, we

respectfully ask this Court to consider a comparison to a parallel guideline section that would, under the facts of this case, result in a vastly lower total offense level score.

U.S.S.G. §2A2.4 is also applicable to violations of 18 U.S.C. §111.  The defining issue in determining whether §2A2.2 or §2A2.4 is applicable, is §2A2.4(c) – whether the conduct constituted "aggravated assault."  Section 2A2.2, cmt. 1, defines "aggravated assault" to be:

> …a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.

While the defense argued that one spray of a lachrymatory agent from a distance of fifteen (15) feet, which caused no injuries to the police officer, did not constitute an aggravated assault, the government did not agree and insisted on the application of §2A2.2.[3]  The application of §2A2.4, in the instant case would result in the following total offense level:

| | |
|---|---|
| Base Offense Level: | 10 |
| Specific Offense Characteristics: | |
|   Possession of Dangerous Weapon | 3 |
| | |
| Total Offense Level | 13 |

Thus, it is clear that the application of §2A2.4 creates a vast discrepancy in the guideline level. Indeed, it doubles it.

It is respectfully submitted that §2A2.4 should be considered in determining whether additional downward variance is appropriate given the unique factual circumstances in this case which cause the stipulated total offense level to over-represent the defendant's culpability.

---

[3] In order to receive a cooperation plea agreement with the government, the defendant was required to agree[3] and stipulate to the application of U.S.S.G. §2A2.2 and all of the enhancements which result in a total offense level of 26.  The government would not entertain an analysis under §2A2.4.

While the defendant's conduct for purposes of satisfying the elements of the crime of 18 U.S.C. §111(b) is sufficient, it is respectfully submitted that this Court should consider his actual conduct in its decision as to the appropriateness of a downward variance from the guidelines.  The defense has reviewed many decisions of the various district court judges which have focused upon the issues involving (1) whether a felonious assault requires the intent to commit another felony;  (2) whether a lachrymatory agent is a dangerous weapon; and (3) whether the U.S.S.G. §2A2.2 and the imposition of a six (6) point enhancement under §3A1.2(a) and (b) is double-counting for an official victim.  However, defendant Lazar pled to the guidelines that he did because he wanted to begin cooperating with the government and wanted to proffer all of the information that he had.  Therefore, we honor our plea agreement and simply ask the Court to consider the unique facts of his case in fashioning a downward departure and variance that is fair and just given his actual conduct.  We do not seek to challenge that application of the guidelines that we have agreed to.

It is, however, respectfully submitted that the application of the stipulated guideline, §2A2.2, and the additional enhancements to the instant offense, seriously over-represent the defendant's conduct.  The stipulated guideline level in this case results in absolutely no distinction between the actions of defendant Lazar and the extremely violent, lawless perpetrators of the assault upon the Capitol, building who trampled, beat and overwhelmed the law enforcement officers with dangerous weapons and excessive force.  Therefore, the defense moves for a downward variance and respectfully requests that this Court consider the guideline calculations resulting from the application of §2A2.4, in determining a sentence that is just and fair.

**B. Pretrial Detention During Covid Has Resulted In Extraordinarily Harsh Conditions of Confinement**

The past year and eight (8) months that Mr. Lazar has spent in prison have been extremely arduous.  Since Mr. Lazar's arrest on July 21, 2021, he has been moved a total of seven (7) times.  including the Lehigh County Jail, Federal Detention Center, Philadelphia, Northern Neck Regional Jail, Virginia and FCP Lewisburg, Pennsylvania.  He has been in continual lockdowns due to COVID restrictions, was unable to be outdoors more than one hour per day for approximately four (4) months, can only shower every three or four days, and had no working ventilation in his cell or cellblock in Lewisburg for many months.  Additionally, for months on end, he has been confined to his cell, for the majority of the day, with another inmate due to COVID restrictions.  Further, he has experienced food deprivation, rodent feces in his cell, inadequate bedding covers to provide heat requiring sleeping in a fetal position and preventing sleep.  While in custody in 2021 in Northern Neck Regional Jail in Virginia, he caught COVID and was extremely ill, with high fevers, body aches and a respiratory inflammation.  He received no medical treatment at all; not even an Advil or aspirin to relieve the fever.

Mr. Lazar has also been unable to participate in any prison programs which would be available to a designated, sentenced prisoner.  These conditions are far more difficult and punitive than would ordinarily exist if Mr. Lazar were a designated, sentenced inmate rather than a pretrial detainee during Covid.

As such, it is respectfully suggested that this Court should consider that each day spent under such arduous pretrial conditions is not the equivalent as an equivalent amount of time served as a designated, sentenced prisoner and that a downward variance is appropriate to make accommodation for these incredibly harsh conditions.

## **CONCLUSION**

For all of the reasons detailed above, it is respectfully submitted that a sentence of time served is warranted. ███████████████████████████████████████

████████████████████████████ Mr. Lazar's excellent relationship with his family, friends and members of the community; extraordinary acceptance of responsibility,

████████ deep remorse, rehabilitation are all substantial mitigating factors weighing in favor of a sentence of time served.

Respectfully,

HOPE C. LEFEBER, LLC

By:

_____
HOPE C. LEFEBER, ESQUIRE

## CERTIFICATE OF SERVICE

I certify that a copy of the attached Sentencing Memorandum was served upon the following counsel, by electronic filing, on March 3, 2023:

Douglas Collyer, AUSA
United States Attorney's Office
14 Durkee Street;  Suite 340
Plattsburgh, New York 12901

/s/

_____
HOPE C. LEFEBER