UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SAMUEL LAZAR,<br><br>Defendant. | Case No. 22-cr-071-ABJ |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Samuel Lazar to 36 months' incarceration, 3 years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment on his guilty plea to 18 U.S.C. § 111(a) and (b), assaulting, resisting or impeding certain officers using a dangerous weapon. This recommendation reflects the seriousness of Lazar's offense, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

### I.     INTRODUCTION

Defendant Samuel Lazar, a self-employed business owner from Ephrata, Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol building--a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United

1

Lazar directly contributed to the violence unleashed on January 6, 2021 by, *inter alia*, spraying a lacrimatory agent at police holding a defensive line and by encouraging others to use violence.

Lazar was vocal and assaultive in his actions at the U.S. Capitol on January 6, 2021, repeatedly approaching law enforcement, swearing at and mocking them until finally discharging a chemical irritant at them. Lazar then bragged about doing so in a recording, saying, "Fuck the tyrants. There's a time for peace and there's a time for war."

████████████████████████ the government recommends that the Court sentence Lazar to 36 months' incarceration, as sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a), particularly considering the violent nature of his crimes.

## II. FACTUAL BACKGROUND

### A. The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history,

---

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration

3

(May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, to date requiring the expenditure of more than $2.8 million in losses.

   **B.**  **Defendant's Role in the January 6, 2021 Attack on the Capitol**

On January 5, Lazar drove to Washington, D.C. from his home in Ephrata, Pennsylvania with members of his family and some friends. On January 6, 2021, Lazar entered onto the restricted grounds of the U.S. Capitol dressed in a camouflaged tactical vest, black hooded sweatshirt, and blue jeans. On his tactical vest was a patch that read, "Blessed be the Lord, my rock, who trains my hands for war, and my fingers for battle." At times, Lazar wore green ski goggles to protect his eyes from chemical irritants deployed by law enforcement and employed use of a bullhorn, as depicted in *Figure One* below:

4



**Figure One**

*Lazar on the West Plaza*

Lazar approached the police barricade line on the West Front of the U.S. Capitol where he aimed a cannister of lachrymatory agent in the direction of U.S. Capitol Police and D.C. Metro Police, who were assisting the U.S. Capitol Police at the time, as depicted in Government's Sentencing Exhibit Three, a screenshot of which is below:



**Exhibit Three**

At approximately 1:13 p.m., Lazar walked along the police line, grabbed the barricade and pulled it with his left hand in an attempt to remove it, while discharging the chemical irritant from a canister in his right hand, apparently unintentionally, as depicted in Government's Sentencing Exhibit One, a screenshot of which is below:



**Exhibit One**

The police told Lazar to "get back" and police deployed a chemical irritant causing Lazar to retreat down the steps. Lazar then turned to face M.C., an officer with Metro Police, and redeployed his chemical irritant toward M.C. and S.L., a U.S. Capitol Police Officer, a second time, causing an officer to lose the ability to see, as depicted in Government's Sentencing Exhibit One, a screenshot of which is below:



**Exhibit One**

At approximately 1:41 p.m., Lazar again approached the line of police officers on the West Front with his bullhorn and displayed his middle finger to them. He then yelled "forward!" to the hundreds of other rioters while signaling them to charge the police, as depicted in Government's Sentencing Exhibit Four, a screenshot of which is below:



**Exhibit Four**

Lazar then yelled to police through his bullhorn "stand the fuck down, LEO's! Stand the fuck down!"[2] while also telling them to "get the fuck out of the way, tyrants!" Lazar offered for the police to "join" him and when none did, he declared to the police, "you now have fucking enemies on both sides!" Lazar again took out his cannister of chemical irritant and held it by his side.

Lazar also encouraged other rioters to forcefully take law enforcement's weapons from them, yelling through his bullhorn, "Let's get their guns! Let's get their guns!" as shown in Government's Sentencing Exhibit Five, a screenshot of which is below:



**Exhibit Five**

After leaving the Capitol grounds, Lazar spoke with someone recording video. Lazar stated, "They maced us, those tyrannical pieces of shit, and we maced them right the fuck back and now they're taking the building." Lazar continued, "They attacked the people. We have a right to defend ourselves. Fuck the tyrants. There's a time for peace and there's a time for war"

---

[2] LEO is short for "law enforcement officer."

8

while pointing to the previously referenced patch on his chest. Lazar answered a question from someone nearby by stating, "I was right at the front, on the tip of the spear, brother. That's where you gotta be" as depicted in Government's Sentencing Exhibit Six, a screenshot of which is below:



**Exhibit Six**

*Injuries*

Although Officers M.C. and S.L., the assault victim in this case, reported that they did not suffer any physical injuries directly attributable to Lazar's actions, Lazar's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attack") *supra.* His violent conduct served to incite and embolden other violent rioters around him.

### III.   THE CHARGES AND THE PLEA

On March 7, 2022, the United States Attorney for the District of Columbia filed a one-count Information charging Lazar with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 USC §111(a)(1) and (b) to which Lazar pleaded guilty pursuant to a plea agreement.





V.   **STATUTORY PENALTIES**

Lazar now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers as a

11

Felony, in violation of 18 U.S.C. §§ 111(a) and (b).

As noted by the U.S. Probation Office, Lazar faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## VI.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

In the plea agreement, the parties stipulated to the following Guidelines analysis:

Count One: 18 U.S.C. § 111(a) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)B | Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | 18 U.S.C. § 111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **26** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **23** |

*See* Plea Agreement at ¶¶ 4(A).

The Probation Office, however, recommends a total offense level of 26, concluding that the offense also involved physical injury to the victim, to wit: MPD Officer M.C. injured his ankle

12

after being sprayed with a lachrymatory agent, and accordingly, a three-level upward adjustment is applied, pursuant to U.S.S.G. § 2A2.2(b)(3)(A). *See* PSR ¶ 43.[3]

The Probation Office calculated Lazar's criminal history as category II, which the government does not dispute. PSR ¶ 58. Accordingly, the government submits the guidelines imprisonment range is 51 to 63 months.[4]

## VII. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Lazar's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Assaults on officers like the one committed by Lazar was a key part of the attack on heavily outnumbered police officers by hundreds of rioters on the West Front of the Capitol that resulted in many dozens of injured officers and property destruction in and

---

[3] MPD Officer M.C. told the FBI that during January 6, he was sprayed with oleoresin capsicum (OC) by more than one person, and he also walked through a cloud of spray at one point. M.C. did not remember the specifics of who sprayed him at any given point. M.C. went to a section of the Capitol to wash his eyes out and due to the spray, M.C. could not see well, missed a step, and injured his ankle, ultimately departing the Capitol with other injured officers via ambulance to the hospital for further evaluation. The government did not apply the three-level upward adjustment under 2A2.2(b)(3)(A) because M.C. was unable to affirmatively state that his ankle injury was a direct result of Lazar's actions, as opposed to the other instances where M.C. was sprayed with or exposed to O.C. that day.

[4] While the Plea Agreement estimated Lazar to be in criminal history category I, the parties agreed that Probation may reach a different conclusion and that the criminal history category may be increased.

13

around the Capitol.  The nature and circumstances of Lazar's offense were of the utmost seriousness, and fully support the government's recommended sentence, ███████████ ████████

### B. Lazar's History and Characteristics

While this conviction represents Lazar's first felony conviction, it is not his first criminal conviction.  Lazar's criminal history consists of multiple prior misdemeanor convictions, including a 2004 conviction for criminal mischief for which he was sentenced to a time served sentence of 41 days in jail. PSR ¶ 55.

In 2012, Lazar was driving in Lancaster, PA when he pulled alongside the victim's vehicle, cursing and screaming.  Lazar punched the passenger side fender of the vehicle, causing $250 in damages for which he was convicted of Disorderly Conduct/Engaged in Fighting.

In 2016, he was convicted for lying on the Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473 in an attempt to obtain a firearm.   Lazar answered "no" to the question, "Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a short sentence including probation?"  Lazar was again denied the purchase of the firearm when his criminal background was shown.  According to the gun store owner, Lazar remarked that he "did not think his criminal history would follow him here."

███████████████████████████████████████████████████████████████

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of

14

incarceration. Lazar's criminal conduct, assaulting law enforcement officers and encouraging other rioters to engage in violence against them, was the epitome of disrespect for the law.

    **D.**    **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

    **E.**    **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with

---

[5] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v.*

16

*Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases involving violations of 18 U.S.C. § 111(b) provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Cody Mattice and James Mault,* 21-cr-657 (BAH). Co-defendants Mattice and Mault each planned for violence on January 6 and violently attacked the police. Mattice recorded Mault encouraging police to stand aside to allow the rioters to invade the Capitol. When police did not move, Mattice pulled down a section of barricade and the pair led a mob that penetrated the police line on the West Plaza, forcing police to retreat. Mattice later used a chemical spray against police in the area of the Lower West Terrace. Mattice and Mault were each sentenced to 44 months incarceration and 36 months supervised release. Neither had a criminal history,

*United States v. Palmer*, 21-cr-328-TSC. Palmer deployed the contents of a fire extinguisher directly into the Lower West Terrace tunnel onto police officers then threw it at the officers seconds later. Palmer also threw objects into the tunnel at officers. Palmer faced a sentencing range of 63-78 months and was sentenced to 63 months' imprisonment.[8]

*United States v. Jacob Fracker,* 21-cr-034 (CRC). Fracker, a police officer from Virginia, and his co-defendant, Thomas Robertson, approached the Lower West Terrace at the Capitol where they joined an advancing mob of rioters. They both entered the Capitol separately and met up inside.

---

[8] Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1, because of his post-plea conduct. Had he received that reduction, Palmer's guideline range would have been 46-57 months' incarceration.

18

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ He was sentenced to 12 months' probation and 59 days home confinement.

## VIII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[9] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, M.C. did not suffer bodily injury as a direct result of Lazar's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Lazar must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Lazar played in the riot on January 6.[10] Plea Agreement at ¶ 12. As

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Lazar's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 146.

### IX. CONCLUSION

For the reasons set forth above, ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ the government recommends that the Court impose a sentence of imprisonment of 36 months' incarceration, 3 years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*/s/Douglas G. Collyer*
DOUGLAS G. COLLYER
Assistant United States Attorney
District of Columbia Detailee
N.D.N.Y. Bar 519096
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, NY 12901
(518) 314-7800
Douglas.Collyer@usdoj.gov